IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 22-cv-01592-LTB-SBP

MINDY SZETO,

      Plaintiff,

v.

UNIVERSITY OF COLORADO, by and through The Regents of the University of
Colorado, a body corporate; and
LESLIE LANGE,

      Defendants.

---

MEMORANDUM OPINION AND ORDER

---

Lewis T. Babcock, Senior United States District Judge

This case is before me on Defendants' Motion for Summary Judgment
Pursuant to Fed. R. Civ. P. 56 [ECF No. 47] (the "Motion"). After consideration of
the Motion, all related pleadings, and the case file, I grant Defendants' Motion for
the reasons set forth below.

## I. Background

This action arises out of Plaintiff's enrollment in Defendant University of
Colorado's ("the University") Medical Scientist Training Program ("MST Program"
or "MSTP") in 2014. Ex. A to Motion at 7: 1-3.[1] The MST Program is a dual-degree

---

[1] The Court generally references the page number generated by the court's Case
Management/Electronic Case Files ("CM/ECF") system when citing the parties' exhibits.

program where students work towards earning both an M.D. and a Ph.D. by first

completing two years at the University's School of Medicine ("SOM" or "Medical

School"); then taking a leave of absence from the Medical School to pursue a Ph.D.

in the Graduate School; and then returning to the Medical School to complete the

last two years for an M.D. degree. Ex. B to Motion at 6.

Plaintiff successfully completed the first two years of her studies at the

Medical School. Ex. A at 11: 5-10. The Handbook for the MST Program provides

that by the end of the first two years, students will have taken the United States

Medical Licensing Examination ("USMLE") Step 1. Ex. B at 17. The Handbook

further provides that:

> **The deadline for MSTP MSII students to take the USMLE Step 1 is
> the same for all SOM MSII students.** Further, similar to SOM
> students, after taking STEP 1, MST Program students start their
> clinical rotation when the MSIII year begins. Achieving a passing score
> on USMLE Step 1 is REQUIRED in order to progress to an MSIII
> clinical rotation. Students must receive permission from the Director
> and/or the Associate Directors if they are unable to meet this deadline.
> **Students who delay their exam without prior approval from the SOM,
> MSTP Director and/or Associate Directors will be in violation of
> professionalism and honor code and will be sent to the Promotions
> Committee to review.**

*Id.* at 18.

Plaintiff alleges that she has seen students take the USMLE Step 1 "anytime

during their Ph.D.s," but is not sure when the rest of her class took this exam. Ex. A

at 13:14-14:5. Plaintiff did not take the USMLE Step 1 at the end of her second year

in the MST Program. Ex. A at 16:21-24.

---

For depositions, however, the Court references the transcript page number found in the
bottom right-hand corner of each page.

Students in the MST Program are required to complete at least two supervised rotations in scientific labs prior to choosing a thesis advisor. Ex. B at 16. Plaintiff completed her first lab rotation during her first two years at the Medical School. Ex. A at 25:4-8.

In the summer of 2016, Plaintiff was required to do certain things in preparation for the commencement of the Ph.D. portion of the MST Program. Ex. A at 30:16-25; Ex. B at 19. Plaintiff, however, left town for family reasons sometime around May of 2016. Ex. A at 27:10-14. Plaintiff states that she informed her second rotation supervisor and a dean of student life at the Medical School that she was leaving and that she thought "communications were happening." Ex. A at 18:3-19:7; 50:14-51:1.

In July and August of 2016, Dr. Arthur Gutierrez-Hartmann, the MST Program director, and Emily Dailey, the MST Program administrator also referred to as Emily Thomas, emailed Plaintiff indicating that Dr. Gutierrez-Hartmann wanted to speak to her about her next lab rotation and other matters. Ex. C to Motion. In these emails, Dr. Gutierrez-Hartmann indicated that he was unaware of the details surrounding Plaintiff's absence. *Id.* at 3, 4 & 6. Plaintiff responded that she was trying to find a suitable flight to return to Denver and would keep them updated via email. *Id.* at 7.

Plaintiff returned to Denver sometime in September of 2016, and had items to complete for compliance with MST Program requirements. Ex. A at 80:22-81:3 & 82:17-23. Plaintiff was planning to take the USMLE Step 1 in December of 2016,

but did not do so. Exs. E & F to Motion. By email dated December 8, 2016, Dr.

Gutierrez-Hartmann advised Plaintiff that she should take the USMLE Step 1 by

mid-January 2017 and needed to meet with a tutor in advance. Ex. G to Motion. By

email dated January 4, 2017, Plaintiff advised the tutor that she had severe

pneumonia and would not be on campus to meet with her on the proposed date. Ex.

H to Motion.

On January 18, 2017, Dr. Gutierrez-Hartmann and the tutor exchanged

emails about a delay in Plaintiff taking the USMLE Step 1. Ex. J to Motion.

Plaintiff was scheduled to meet with Dr. Gutierrez-Hartmann and Ms. Dailey on

January 20, 2017, but cancelled due to burns she sustained from spilling a

coffeepot. Ex. K to Motion. Dr. Gutierrez-Hartmann then provided Plaintiff with a

Memorandum of Understanding which listed Plaintiff's "history of failing to meet

guidelines, requests, and/or requirements" and setting forth "expectations moving

forward," including taking the USMLE Step 1 by March 1, 2017. Ex. L to Motion.

Plaintiff, Dr. Gutierrez-Hartmann, and Ms. Dailey exchanged emails

throughout February of 2017 regarding Plaintiff's taking of the USMLE Step 1. Ex.

M to Motion. In these emails, Plaintiff stated that she was suffering from post-

pneumonia fatigue. *Id.*

In March of 2017, Dr. Gutierrez-Hartmann and Dr. Kristina Tocce, assistant

dean of student life at the Medical School, approved Plaintiff for a leave of absence

"[d]ue to continued inappropriate behavior, an inability to complete sufficient

academic progress[,] and recent medical issues." Ex. N to Motion. The leave of

absence was "so that [Plaintiff] can focus on completing required academic milestones, specifically USMLE Step 1." *Id.* Plaintiff resisted taking a leave of absence and appealed this decision to Shawna McMahon, assistant dean of the Graduate School. Ex. O to Motion. Dr. McMahon supported the decision to offer Plaintiff a leave of absence as an alternative to discontinuation/dismissal. *Id.* Plaintiff requested that her leave be documented as "medical." Ex. P to Motion.

On March 15, 2017, Plaintiff contacted the University's Office of Equity about a potential gender discrimination case. Ex. Q to Motion. There is no mention of sexual harassment in the Office of Equity's report. *Id.*

On June 6, 2017, the Medical School's Student Promotions Committee ("SPC") reminded Plaintiff of the approaching July 12, 2017 deadline for her to receive a passing score on the USMLE Step 1 in accordance with University policy which gives students a 16-month window to pass this exam. Ex. R to Motion. The SPC is responsible for monitoring student performance and assisting medical students with academic and professional issues as they progress towards graduation. Ex. S to Motion.

Plaintiff indicated that she needed an extension of the USMLE Step 1 deadline because she was still "pursuing medical clearance to resume academic endeavors." Ex. U to Motion. The SPC granted Plaintiff an extension until August 15, 2017 to take the USMLE Step 1. Ex. V to Motion. In August of 2017, Plaintiff requested another extension and was given a "final" extension until September 30, 2017 to take the USMLE Step 1. Ex. W to Motion. When Plaintiff failed to meet this

deadline, she was asked to appear at the SPC's next meeting "for consideration of Dismissal or Administrative Withdrawal." Ex. X to Motion. Plaintiff did not appear at the SPC's meeting but submitted a letter to the committee. Ex. Y to Motion.

On January 22, 2018, the SPC issued a written letter mandating that Plaintiff fulfill certain requirements, including completing an intake appointment with the Colorado Physicians Health Program (the "CPHP"). *Id.* The CPHP is an independent entity, partly funded by physicians' license fees, which is staffed by qualified and experienced physicians and clinicians who evaluate medical students and physicians facing a wide range of challenges, including stress and anxiety. Ex. T at 15:12-16:7; Ex. Z to Motion. The CPHP also evaluates and monitors individuals for any psychiatric or medical conditions that affect their ability to practice medicine. Ex. 6 to Response. CPHP evaluation and monitoring are free of charge, but any counseling or psychiatric services to which the CPHP refers individuals are not. *Id.* The SPC regularly refers struggling students to the CPHP for assessment and to determine if the program has resources or services that could assist them. Ex. T at 15:12-16:7; 17:16-19:24; & 44:13-46:8.

Plaintiff expressed concerns to the Office of Equity that Dr. Gutierrez-Hartmann influenced the SPC's mandated requirements and suggested that the Office of Equity contact Dr. John Repine, Plaintiff's student advocate. Ex. AA to Motion. The Office of Equity reached out to Dr. Repine but was "unable to corroborate that [he] disagree[d] with the [SPC's] actions." *Id.*

Plaintiff took the USMLE Step 1 in January of 2018 and was invited to join the lab of Defendant Leslie Lange ("Dr. Lange"). Ex. BB to Motion. In July of 2018, Plaintiff was formally admitted to the Human Medical Genetics and Genomics Program (the "HMGG Program") as a Ph.D. student. Ex. CC to Motion.

As of January 2020, Plaintiff had not shared a complete draft of her required thesis with Dr. Lange, her thesis advisor. Ex. EE to Motion. Although she was "uncomfortable" doing so, Dr. Lange signed a form with an April 2020 return to the Medical School for Plaintiff "with the understanding that these dates are very often pushed back and this date was given only under the extremely unlikely event that everything would come together for an April defense [of Plaintiff's dissertation.]" *Id.* Thesis committee chair Dr. Matthew Taylor expressed concerns about misrepresentations/miscommunications by Plaintiff surrounding the April 2020 date. Ex. FF to Motion.

On March 3, 2020, leadership of the MST Program and the Medical School, including Dr. Gutierrez-Hartmann and Dr. Lange, had a meeting to discuss Plaintiff and "her repeated professionalism issues." Ex. GG to Motion. On April 3, 2020, Dr. Lange sent Plaintiff an email with "a list of requirements … to make sure that [they were] on the same page." Ex. HH to Motion. Plaintiff emailed Dr. Taylor the next day and indicated that she had "continued concerns about [Dr. Lange's] advising, and also about her well-being especially at this time." Ex. II to Motion at 9.

In April of 2020, Plaintiff requested an authorship policy for Dr. Lange's lab, and one was provided to her on May 7, 2020. Ex. JJ to Motion. Plaintiff had not provided any written work to Dr. Lange as of June 3, 2020. *Id.* Dr. Lange referred Plaintiff to the Office of Research Integrity regarding her concerns with Dr. Lange's authorship practices. Ex. KK to Motion.

By letter dated June 26, 2020, Dr. Lange documented Plaintiff's dismissal from her lab and her resignation as Plaintiff's thesis advisor. Ex. NN to Motion. Dr. Lange stated that the "fundamental reason" for her decision "revolves around [Plaintiff's] inability to provide [Dr. Lange] written materials directly related to [her] progress on [her] dissertation despite [Dr. Lange's] numerous requests over the last several months for [her] to do so." *Id.*

On July 1, 2020, Dr. Tamim Shaikh, head of the HMGG Program, met with Plaintiff and gave her until July 31, 2020, to find a new advisor. Ex. PP to Motion. Plaintiff reached out to Dr. Huntington Potter about serving as her advisor. Ex. QQ to Motion. Based partly on an email exchange with Dr. Potter that he characterized as "as another misrepresentation of the facts," Dr. Taylor resigned as the chair of Plaintiff's thesis committee. Ex. SS to Motion. Dr. Taylor provided Dr. Shaikh with an appendix listing some of his experiences with Plaintiff that he viewed "as crossing over into unprofessional territory." Ex. TT to Motion.

On July 20, 2020, Dr. Shaikh wrote Plaintiff a follow-up letter to a Zoom meeting with her to discuss the professionalism issues raised by Dr. Taylor and requested that Plaintiff respond in writing to specific questions. Ex. UU to Motion.

On July 31, 2020, Dr. Shaikh sent Plaintiff a zoom link for a meeting because he had not heard from her about a new advisor, but Plaintiff did not participate in this meeting. Ex. VV to Motion. On August 3, 2020, Dr. Shaikh dismissed Plaintiff from the HMGG Program. *Id.* At that time, Dr. Shaikh did not know that Plaintiff had made complaints about Dr. Gutierrez-Hartmann, who had retired prior to Dr. Shaikh's dismissal of Plaintiff from the HMGG Program. Ex. XX to Motion at 42:18-43:12; Ex. AAA to Motion at 44:22-45:2.

Dr. David Engelke, dean of the Graduate School, rejected Plaintiff's appeal of her dismissal from the HMGG Program and the Graduate School. Ex. ZZ to Motion. On September 4, 2020, the MST Program's Executive Committee voted to dismiss Plaintiff from the MST Program. Ex. CCC to Motion.

On October 21, 2020, Plaintiff participated in a Zoom meeting with the SPC regarding a return to the Medical School. Ex. EEE to Motion. After hearing from and questioning Plaintiff, SPC members expressed concerns about Plaintiff's lack of accountability and ability to communicate and voted to refer Plaintiff to the CPHP for an evaluation. *Id.* The SPC then advised Plaintiff that it was requiring her to be evaluated by the CPHP "in order to determine the nature of what [it] perceive[d] is unprofessional behavior and offer any recommendations for remediation" and to adhere to all CPHP recommendations. Ex. FFF to Motion.

Plaintiff refused to undergo an evaluation with the CPHP and appealed this decision to Shanta Zimmer, senior associate dean at the Medical School. Ex. GGG to Motion. Dr. Zimmer met with Plaintiff and told her: (1) the CPHP was a neutral

evaluator to assist students in succeeding at medical school; (2) the University does not make assessments of students' mental health; (3) referrals to the CPHP are for a variety of reasons, including mental health evaluations; (4) Plaintiff was being referred to the CPHP because of her history of unprofessional behavior and the various challenges she had faced, including delays in taking the USMLE Step 1, and not because of any suspected "condition"; and (5) Dr. Zimmer was not aware of any investigations or legal matters involving Plaintiff. *Id.* Dr. Zimmer upheld the SPC's recommendation. Ex. HHH to Motion.

On February 15, 2021, Plaintiff filed a formal complaint against Drs. Gutierrez-Hartmann, Zimmer, and Brian Dwinnell, associate dean of student life at the Medical School, alleging discrimination based on sex and disability and retaliation. Ex. III to Motion. The SPC delayed the CPHP evaluation requirement until the Office of Equity reviewed Plaintiff's allegations. Ex. JJJ to Motion. The Office of Equity concluded that (1) Plaintiff's allegations against Dr. Guttierez-Hartmann did not support a violation of the University's Sexual Misconduct Policy; (2) more information was needed to warrant an investigation against Dr. Dwinnell; (3) its investigation failed to establish that Dr. Zimmer violated the University's Nondiscrimination Policy. Exs. KKK, LLL & MMM to Motion.

After the Office of Equity's review was completed, the SPC asked Plaintiff whether she intended to fulfill its requirement that she have a CPHP evaluation. Ex. NNN to Motion. Plaintiff responded that she did intend to do so because the requirement was discriminatory and retaliatory. Ex. OOO to Motion. The SPC

invited Plaintiff to attend its next meeting, but Plaintiff submitted a written response instead. Exs. PPP & QQQ to Motion. The SPC reiterated its requirement of a CPHP evaluation. Ex. QQQ. Plaintiff did not fulfill this requirement, and the SPC recommended her dismissal from the Medical School. Ex. RRR to Motion.

Following my partial granting of Defendants' Motion to Dismiss [ECF No. 32], Plaintiff has pending claims against the University for (1) Title IX retaliation predicated on her dismissal from the Graduate School; (2) Title IX retaliation predicated on her referral to the CPHP and dismissal from the Medical School; and (3) violation of Title II of the ADA. Plaintiff also has a pending § 1983 claim against Dr. Lange, in her individual capacity, for retaliation in violation of Plaintiff's First Amendment rights. By the Motion, Defendants seek summary judgment on all of Plaintiff's remaining claims.

## II. Standard of Review

The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file

together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980).

The operative inquiry is whether, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. Analysis

### A. Plaintiff's Title IX Retaliation Claims

Title IX prohibits discrimination by recipients of federal education funding and supports a private cause of action for retaliation against a person who has complained of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-174 (2005). "[T]o state a claim for retaliation under Title IX, a plaintiff must allege that: (1) he or she engaged in protected activity; (2) defendant had knowledge of the protected activity; (3) materially adverse school-related action was taken against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Tackett v. Univ. of Kan.*, 234 F. Supp.3d 1100, 1109 (D. Kan. 2017) (citations omitted).

Under the burden-shifting framework of *McDonnell Douglas Corp.,* 411 U.S. 792, 802 (1973), a Title IX plaintiff must first establish a prima facie case for retaliation by showing an adverse action against the plaintiff based on the plaintiff's protected activity. *Haitt v. Colo. Seminary,* 858 F.3d 1307, 1316 (10th Cir. 2017). The burden then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse action. *Id.* If the defendant satisfies this burden, then the plaintiff must show that there is a genuine issue of material fact that the stated reason is pretextual to avoid summary judgment. *Id.*

### 1. Plaintiff's Title IX Retaliation Claim Predicated on Her Dismissal from the Graduate School

Defendants argue that Plaintiff cannot show that there was a causal connection between her protected activity and her dismissal from the Graduate School. Specifically, Defendants assert that there is no evidence to show that Dr. Shaikh or Dr. Engelke, the decisionmakers responsible for Plaintiff's August 2020 dismissal from the Graduate School, knew of her complaints concerning Dr. Guttierrez-Hartmann. I agree.

To establish the requisite causal connection for her Title IX retaliation claims, Plaintiff must show that the decisionmakers took adverse action against her out of a desire to retaliate for her protected activity. *Singh v. Cordle,* 936 F.3d 1022, 1043 (10th Cir. 2019). "As a prerequisite to this showing, [Plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to [take adverse action against her] had knowledge of [her] protected

activity." *Id.* (quoting *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008)).

Plaintiff presents no evidence of direct knowledge on the part of Dr. Shaikh and Dr. Engelke but instead relies on evidence that Dr. Lange was aware of Plaintiff's complaints about Dr. Gutierrez-Hartmann. Plaintiff argues that Dr. Lange's knowledge is significant because it was her conduct in resigning as Plaintiff's thesis advisor that set in motion the chain of events that ultimately led to Plaintiff's dismissal from the Graduate School.

Plaintiff's reliance on Dr. Lange's knowledge is tenuous since the direct cause of Plaintiff's dismissal from the Graduate School was not Dr. Lange's resignation, but rather Plaintiff's failure to find a new advisor. There is no evidence that Dr. Lange was involved in the decision to give Plaintiff a 30-day deadline to accomplish this task. Plaintiff's argument that there is an "unbroken chain" between Dr. Lange's resignation and Plaintiff's dismissal from the Graduate School that could support a finding that Dr. Shaikh and Dr. Engelke had knowledge of Plaintiff's protected activity notwithstanding the lack of evidence showing such knowledge also lacks merit.

Even if Dr. Lange's resignation is considered as the requisite adverse action for Plaintiff's retaliation claim based on her dismissal from the Graduate School, Defendants further argue that Dr. Shaikh and Dr. Engelke's lack of knowledge of Plaintiff's protected activity breaks the causal chain between Dr. Lange's action and Plaintiff's dismissal from the Graduate School. I agree.

As already discussed, there is no evidence that Dr. Shaikh's decision to set a
30-day deadline for Plaintiff to find a new advisor or Dr. Engelke's rejection of
Plaintiff's appeal of her dismissal from the Graduate School for failing to meet this
deadline was tainted by knowledge of Plaintiff's protected activity. These
independent and untainted actions are sufficient to break any causal link between
Dr. Lange's resignation and Plaintiff's dismissal from the Graduate School when
she failed to find another advisor. *See Parker v. United Airlines, Inc.,* 49 F.4th
1331, 1335 (10th Cir. 2022) (requisite causal link for retaliation claim is broken
when an independent decisionmaker conducts investigation and decides to fire
employee). *See also Singh,* 936 F.3d at 1038-1039 (10th Cir. 2019) (employer can
break the causal chain between a subordinate's biased behavior and adverse
employment action in Title VII case by another's independent investigation).

Dr. Shaikh and Dr. Engelke's lack of knowledge of Plaintiff's protected
activity also undercuts Plaintiff's argument that close temporal proximity between
her protected communications to Dr. Lange in June of 2020 and her dismissal from
the Graduate School the same month adequately establishes causation. While a
causal connection may be shown by temporal proximity, a showing of causation in
this manner still requires evidence that the decisionmakers knew of the protected
activity. *Singh*, 936 F.3d at 1043-1044.

Because Plaintiff has failed to demonstrate a causal connection between
protected activity and her dismissal from the Graduate School, the University is

entitled to summary judgment on Plaintiff's Title IX retaliation claim based on this dismissal.

### 2. Plaintiff's Title IX Retaliation Claim Predicated on CPHP Referral and Dismissal from the Medical School

Defendants first argue that the CPHP referral was not a materially adverse action to support Plaintiff's claim for Title IX retaliation by the Medical School. I agree.

The Tenth Circuit liberally defines adverse action to include "acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1239 (10th Cir. 2004) (citations omitted). Plaintiff asserts that her referral to the CPHP falls within this definition but cites no evidence to contradict that offered by Defendants' showing that the CPHP's services are confidential. *See* Ex. Z to Motion. Plaintiff also concedes that the University routinely refers students to the CPHP and that this program evaluates medical students for a wide range of challenges, including stress and anxiety. *See* Ex. HHH to Motion; Motion at 8, ¶¶42-43 & Response at 4, ¶¶42-43. Plaintiff's speculative assertion that she would have had to pay for any counseling or psychiatric services recommended by the CPHP likewise fails to establish a triable issue that her referral, standing alone, was a materially adverse action.

Even if the CPHP referral is viewed in combination with Plaintiff's dismissal from the Medical School to establish the requisite materially adverse action, Plaintiff present no evidence to show that any member of the SPC knew of her

complaints against Dr. Guttierrez-Hartmann at the time it first referred Plaintiff to the CPHP in January of 2018, or when it reinstated the requirement of a CPHP evaluation in October of 2021. Plaintiff argues, however, that such knowledge can be inferred from evidence purportedly showing that the well-documented and ongoing legitimate concerns over Plaintiff's professionalism were pretextual. This argument is unconvincing, and I conclude that Plaintiff has failed to show the requisite knowledge by the SPC that is required to establish a causal connection between her protected activity and her dismissal from the Medical School. *Singh*, 936 F.3d at 1043. The University is therefore entitled to summary judgment on Plaintiff's Title IX retaliation claim predicated on her referral to the CPHP and subsequent dismissal for the Medical School.

## B. Plaintiff's ADA Claim

To state a claim under Title II of the ADA, Plaintiff must show that (1) she is a qualified individual with a disability; (2) she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of Plaintiff's disability. *J.V. v. Albuquerque Pub. Schs.,* 813 F.3d 1289, 1295 (10th Cir. 2016). An individual is considered to have a disability if they are regarded as having a physical or mental impairment. 42 U.S.C. § 12102(1) & (3).

Defendants argue that Plaintiff's ADA claim fails because there is no evidence that the University regarded her as disabled or that she was referred to CPHP because of a perceived disability. I agree.

Defendants have presented a wealth of convincing and consistent evidence showing that the Medical School's SPC referred Plaintiff to the CPHP because of ongoing and well-founded concerns about her professionalism in, among other things, communicating; interacting with others; and meeting deadlines. *See, e.g.,* Exs. EEE, FFF, QQQ & RRR to Motion. *See also* Ex. GGG to Motion (Dr. Zimmer explaining that Plaintiff was not being referred to the CPHP because of any "condition"). Defendants have also demonstrated that the University routinely refers Medical School students who are struggling to the CPHP to address issues such as stress and time management. *See, e.g.,* Exs. T & GGG to Motion.

The only evidence that Plaintiff presents to rebut Defendants' evidence is a broad statement from a CPHP employee that the CPHP evaluates and monitors individuals for medical or psychiatric issues that affect their ability to practice medicine. *See* Ex. 6 to Response. This statement has no bearing on the specific reasons that Plaintiff was referred to the CPHP. In fact, the same CPHP employee also stated that it was his understanding that Plaintiff was referred to the CPHP because of concerns about unprofessional behavior. *Id.* at 6:19-7:02; 8:49-10:00; & 12:49-13:39.

Because Plaintiff has failed to demonstrate a triable issue as to whether the University regarded her as disabled or referred her to the CPHP because of a

perceived disability, the University is entitled to summary judgment on Plaintiff's ADA claim.

## C. Plaintiff's § 1983 Claim for First Amendment Retaliation Against Dr. Lange

To establish her § 1983 claim for First Amendment retaliation against Dr. Lange in her capacity as a student in the Graduate Program, Plaintiff must show that: (1) she engaged in constitutionally protected activity; (2) Dr. Lange's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) Dr. Lange's adverse actions was substantially motivated as a response to Plaintiff's exercise of constitutionally protected activity. *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000).

Defendants argue that Plaintiff's retaliation claim against Dr. Lange fails under the third element because there is no evidence that Dr. Lange was substantially motivated to resign as Plaintiff's thesis advisor and dismiss Plaintiff from her lab by Plaintiff's allegations against Dr. Gutierrez-Hartmann or her complaints about Dr. Lange's authorship practices. I agree.

Dr. Lange cited Plaintiff's "inability to provide [Dr. Lange] with written materials directly related to [Plaintiff's] progress on [her] dissertation despite … numerous requests over the last several months" as the "fundamental" reason for her resignation as Plaintiff's thesis advisor and dismissal of Plaintiff from her lab in June of 2020. Ex. NN to Motion. This explanation is supported by substantial evidence documenting ongoing concerns that Dr. Lange and other members of the Graduate Program had with Plaintiff's progress on her thesis and failure to provide

written copies of it to Dr. Lange, as well as efforts undertaken to resolve these issues, beginning several months earlier in January of 2020. *See* Exs. EE, FF, GG, HH & JJ to Motion. Dr. Lange's concerns were well-founded since she, as Plaintiff's thesis advisor, was responsible for reading, providing feedback, and editing Plaintiff's thesis. Ex. OO to Motion at 58:20-59:10 & 61:25-62:16.

Furthermore, the well-documented concerns about Plaintiff's thesis predate evidence showing that Plaintiff expressed concerns regarding Dr. Lange's authorship practices months later in April of 2020. Exs. II & JJ to Motion. Once Plaintiff expressed concerns about her authorship practices, Dr. Lange provided a written policy and invited Plaintiff and other members of her lab to convey any concerns they had about it. Ex. NN to Motion. No specific concerns about the policy had been received at the time of Dr. Lange's resignation over six weeks later, nor had Plaintiff provided any written materials to Dr. Lange or anyone else in the MST or Graduate Program despite repeated requests that she do so. *Id.*

Plaintiff has also failed to present evidence of any specific communications she had with Dr. Lange regarding Dr. Guitirrez-Hartmann when the issues surrounding Plaintiff's thesis first arose. At best, Plaintiff may be able to show that she disclosed specific concerns about Dr. Gutierrez-Hartmann to Dr. Lange in June of 2020. Ex. 1 to Response at 277:3-20. The pattern of conduct that justifiably resulted in Dr. Lange's resignation as Plaintiff's thesis advisor and dismissal of Plaintiff from her lab was already well underway at that point.

Because Plaintiff has failed to demonstrate an issue of material fact as to whether Dr. Lange was substantially motivated to resign as Plaintiff's thesis advisor and dismiss Plaintiff from her lab because of Plaintiff's allegations against Dr. Gutierrez-Hartmann or her complaints about Dr. Lange's authorship practices, Dr. Lange is entitled to summary judgment on Plaintiff's § 1983 claim. I therefore need not address Defendants' alternative argument that this claim is barred by the doctrine of qualified immunity.

## IV. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1. Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 47] is GRANTED;

2. Judgment shall enter in favor of Defendant University of Colorado on Plaintiff's claims for Title IX retaliation predicated on her dismissal from the Graduate School; Title IX retaliation predicated on her referral to the CPHP and dismissal from the Medical School; and violation of Title II of the ADA; and

3. Judgment shall enter in favor of Defendant Leslie Lange on Plaintiff's claim for § 1983 claim for First Amendment retaliation; and

4. Defendants are entitled to costs pursuant to Fed. R. Civ. P. 54(d)(1) and

D.C.COLO.LCivR 54.1.


Dated: February 19, 2025 in Denver, Colorado.

                                    BY THE COURT:


                                    s/Lewis T. Babcock
                                LEWIS T. BABCOCK, JUDGE